The Honorable Marsha J. Pechman
Trial: October 27, 2014

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

DEBI HUMANN,

               Plaintiff,

      vs.

CITY OF EDMONDS, a municipal
corporation; and  MICHEAL COOPER, in his
individual and official capacities,

              Defendants.

CASE NO.:  2:13-cv-00101-MJP

PLAINTIFF'S TRIAL BRIEF

**PRE-TRIAL CONFERENCE:
SEPTEMBER 12, 2014**

## I.      SUMMARY OF THE CASE

This is a case of small town political corruption. Debi Humann was fired from her position as Human Resources Director for the City of Edmonds because she (1) raised and/or relayed concerns about the compensation, hours worked, timesheets, and vacation and sick leave of the Mayor's frequently absent executive assistant Kimberly Cole and (2) participated in a related Washington State Auditor's Office investigation. She filed a whistleblower complaint and press release which referred to Ms. Cole's hours and compensation and alleged "improper payroll practices." These statements generated negative media attention to the City and the Mayor's office at the same time Ms. Humann was seeking reinstatement to her position. Through two investigations, City officials soon learned that Ms. Humann could have a

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798  (206) 682-6711

meritorious whistleblower claim, which would expose the City to liability for back pay, and would likely require that the City reinstate Ms. Humann to her position. The Edmonds City Council responded to Ms. Humann's protected speech and petitioning by eliminating funding for the Human Resources Director position from the 2012 City budget. Three weeks later, a newly-elected mayor then reinstated Ms. Humann and immediately laid her off in retaliation for her whistleblower claim. In this action Ms. Humann brings claims against the City and former mayor Micheal Cooper for wrongful termination in violation of Washington public policy, First Amendment retaliation, deprivation of a liberty interest without Fourteenth Amendment due process, and defamation.

## II.    FACTUAL BACKGROUND

**A.    Debi Humann and the City of Edmonds Human Resources Department.**

Debi Humann worked at the City of Edmonds for 12 years. Ms. Humann ran the HR Department for seven years. She was an exemplary human resources professional. In 12 years she received only "commendable" or "distinguished" performance ratings and no discipline. Ms. Humann was widely respected among City leaders as knowledgeable, professional, honest, forthright and trustworthy.

**B.    Micheal Cooper Becomes Mayor and Appoints Kimberly Cole as his Executive Assistant.**

In July 2010 the Edmonds City Council appointed Micheal Cooper to complete the term of the prior mayor (who had resigned). He brought in Kimberly Cole as his Executive Assistant. Cooper and Cole were close personal friends with a deeply enmeshed personal and professional relationship. Cole had been Mayor Cooper's campaign manager when he ran for Snohomish County Council in 2007, and he appointed her his Legislative Aide after he won that election. There, Cole was frequently absent from the office. Mayor Cooper faced scrutiny

PLAINTIFF'S TRIAL BRIEF- 2
2:13-CV-00101-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798  (206) 682-6711

about her attendance because Ms. Cole continued to draw a full time salary. Cooper dismissed allegations that Ms. Cole was receiving a gift of public funds at Snohomish County as "a political vendetta."

Cole's work schedule at the City, like her work schedule at Snohomish County, was highly unpredictable. The Executive Assistant to the Mayor serves as the "primary administrative contact" between the mayor, elected officials, and the general public. Cole's responsibilities included answering the mayor's phone, greeting visitors, and scheduling meetings. Due to Cole's unpredictable work schedule, elected officials, City employees, and visitors complained of difficulty reaching the mayor.

It was not surprising that Cole was unable to establish predictable attendance at work. She was overcommitted. In addition to serving as Cooper's Executive Assistant, Cole held elected positions as a Commissioner for the Public Hospital District II and was a Lynnwood City Councilwoman;[1] she was a single parent to her son; and she was attending evening classes at Seattle University law school.

Cole's unavailability and poor attendance was confounding and frustrating to senior staff. In general, directors and senior staff did not complain directly to Cooper about Cole's attendance. Instead, they brought their concerns to Ms. Humann. They expected Ms. Humann, as HR Director, to address Cole's attendance problems with the Mayor.

## C. Ms. Humann Questions Mayor Cooper Regarding Cole's Attendance.

On February 3, 2011, Ms. Humann met with Cooper regarding inaccuracies in timesheets he had approved for Cole. She raised the concern that Cole was collecting a full time salary but was often absent from work. Cooper became defensive when Ms. Humann

---

[1] Cole was later terminated from her position on the Lynnwood City Council due to her failure to maintain regular attendance at Council meetings.

PLAINTIFF'S TRIAL BRIEF- 3
2:13-CV-00101-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798   (206) 682-6711

relayed the many comments and observations she had heard about Cole's absences. The Mayor insisted that <u>he</u> was Cole's supervisor and directed Ms. Humann to discontinue monitoring Cole's timesheets and attendance. Ms. Humann did not track Cole's attendance or otherwise monitor her.

Problems with Cole's attendance continued. Cole repeatedly sought vacation and sick leave she had not accrued. She reported work hours when she had not been in the office. HR Analyst Mary Ann Hardie, who was responsible for entering Cole's timesheets, alerted Ms. Humann to several apparent improprieties. Ms. Humann questioned Cooper a number of times about Cole's attendance. At no point, however, did Cooper explain where Cole was or how she was spending her work time. Instead, he appeared irritated by the conversations and made clear that he did not want to discuss the issue. It appeared to Ms. Humann Cooper was ignoring Cole's potential misconduct. Ms. Humann raised her concerns with the City Attorney Sharon Cates.

In September 2011, the Washington State Auditor responded to an anonymous tip that the City had paid Cole for hours she had not worked and received a gift of public funds. Ms. Humann cooperated in the investigation and notified Cooper of her cooperation. At the time, Cooper was engaged in a difficult campaign to retain his position as mayor, and he wanted to avoid negative press in the weeks leading up to the election.

**D.      Cooper Fires Ms. Humann Because of Her Scrutiny of Cole's Attendance.**

Cole repeatedly complained to Cooper that Ms. Humann was questioning her attendance. Between September 1 and September 13, 2011, Cole sent a series of emails to Cooper containing escalating complaints about Ms. Humann. These complaints focused on Ms. Humann's scrutiny of her attendance and timesheets. She was angry with Mayor Cooper and was considering resigning. Cole complained that Ms. Humann was creating a hostile work

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798   (206) 682-6711

environment. She insisted that Cooper "handle" the situation with Ms. Humann "right now." Cooper worried Ms. Cole would go to the press and create "political fallout" for him during his election campaign.

On September 15, 2011, Ms. Humann questioned the Mayor again concerning his approval of unearned time off for Cole. In a September 30, 2011 internal memo to the City Council, Mayor Cooper wrote that he took Ms. Humann's questions about the timesheet he had approved "as suggesting I was cheating the city and lying." He admitted, "It was after this incident that I made the decision to speak with the City Attorney about terminating Ms. Humann." Cooper discussed with Ms. Cole his intention to fire Ms. Humann.

On September 21, 2011, Cooper placed Ms. Cole on paid administrative leave. The next day, September 22, Cooper fired Ms. Humann. He announced his decision in a statement that was sent to the City Council, all City Directors, and widely published in local news media and on-line:

> I am sending this email to inform you that Debi Humann is [no] longer employed by the City. This is not a decision that came lightly but a change was needed. The city's ability to function relies on a relationship between the Mayor and staff that is based on the highest level of trust and confidentiality. That level of trust has deteriorated to a place where I no longer had confidence in her ability to do the job and to work effectively with me. In order to have the public trust the city needs a committed staff that maintains that highest level of trust with the mayor and council.

On October 5, 2011, the Seattle Times reported Cooper's statement that he had fired Ms. Humann because, "Over time there had been a series of events that just led to a breakdown in trust, and she couldn't work effectively as part of my team."[2]

---

[2] In his Motion to Reconsider filed August 21, 2014, Defendant Cooper claims that he did not make the statement attributed to him by the *Seattle Times*. Dkt. #89 at 2. This, of course, means that whether he made the statement is a disputed fact for the jury.

PLAINTIFF'S TRIAL BRIEF- 5
2:13-CV-00101-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798   (206) 682-6711

News of Ms. Humann's termination sent "an electric shock" through the City. Her co-workers were "in shock" when they learned of Cooper's decision. In addition, the public and media attention surrounding Ms. Humann's termination was intense. Approximately 50 news articles referring to her termination and/or repeating Cooper's statements were published in print media or on-line. Several articles reported that Ms. Humann wanted her job back.

At no time, either before or after her termination, did the City provide Ms. Humann with a hearing regarding the allegations that Cooper made in connection with her termination.

**E.      Mayor Cooper Continues to Protect Ms. Cole and Pay Her Public Funds.**

Minutes after he fired Ms. Humann on September 22, Cooper called Councilmember DJ Wilson for help negotiating a separation package for Cole. Later that day, Cooper offered Cole a generous separation package that would pay her $65,000 and one year of health care benefits if she agreed to resign and not speak to the press for one year. Remarkably, the agreement expressly preserved all of Cole's legal claims against the City.  City Attorney Sharon Cates, attempted to renegotiate the deal "to demonstrate the City is receiving valuable consideration" and "to avoid a claim against the City of a gift of public funds."  Under the second agreement, the City offered to pay Ms. Cole $84,000 in exchange for her resignation and a partial release of claims.  Mayor Cooper specifically "instructed" Ms. Cates <u>not</u> to require a full release of claims, but only "a partial release that will preserve Ms. Cole's claim [against the City] for hostile work environment."

In a September 30, 2011, memo to the City Council, Cooper defended his decisions to fire Ms. Humann and to pay Cole separation pay. He explained his decision to fire Ms. Humann stemmed from her questioning him about Cole's timesheets. Cooper's Memo contained additional allegations that related to Cole. Cooper alleged that Ms. Humann had defied his directive to stop monitoring Cole's time; had told others that Cole only worked part-

PLAINTIFF'S TRIAL BRIEF- 6
2:13-CV-00101-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798   (206) 682-6711

time; had made comments about the personal lives of City employees, including himself; and had publicly discussed a sensitive personnel document after Cole was involved in a motor vehicle accident. Mayor Cooper argued that the separation agreement with Cole was necessary to take prompt action to address Cole's "harassment" complaints.

The City Council voided Cole's settlement agreements as exceeding the Mayor's authority. Cooper responded by maintaining Cole on paid administrative leave until the end of his term.

**F.      Ms. Humann Files a Whistleblower Complaint Seeking Reinstatement.**

On October 12, 2011, Ms. Humann's attorney submitted a whistleblower complaint to the City challenging her termination, pursuant to City Personnel Policy 10.3 and the Local Government Employee Whistleblower Protection Act, RCW 42.41.050. Her complaint sought reinstatement to her position as Human Resources Director, full back pay and benefits, and attorney's fees and costs. She also issued a press release regarding the complaint. Local print and online news media picked up the press release and published articles about Ms. Humann's whistleblower complaint.  Ms. Humann's termination and subsequent whistleblower complaint seeking reinstatement became a near-constant topic of discussion among City officials.

**G.      Outside Investigations Reveal Potential Liability. Officials Meet Repeatedly in Executive Sessions to Discuss Ms. Humann's Complaint.**

In mid-October 2011, the City hired two independent investigators to investigate the events surrounding Ms. Humann's termination: Jim Webber and Susan Coskey.

Jim Webber investigated Ms. Cole's hostile work environment complaint. Cole's allegations were wide-ranging, but they centered on Ms. Humann questioning her attendance and work schedule. The allegations closely echoed the allegations in Mayor Cooper's September 30, 2011 memo to the City Council. After interviewing 20 witnesses, Webber

PLAINTIFF'S TRIAL BRIEF- 7
2:13-CV-00101-MJP

determined that Cole's allegations against Ms. Humann were baseless and he cleared Ms. Humann of all wrongdoing. Webber kept supervising attorney Bucklin fully informed throughout the investigation. Mr. Bucklin, in turn, was in regular communication with City officials.

In mid-October, the City hired special counsel Anne Preston to direct an investigation by Susan Coskey into Ms. Humann's October 12, 2011, whistleblower complaint. Coskey completed her interviews on November 17. Coskey communicated with Preston and the City Attorneys repeatedly during her investigation. Coskey never released a written investigation report.

**H.**     **City Council Eliminates Funding for the Human Resources Director Position.**

On November 6, 2011, David Earling defeated Mayor Cooper in the Edmonds mayoral election.  On November 22, Mayor Cooper attended his last City Council meeting in office. That evening, the City Council voted to amend the 2012 budget to eliminate funding for the Human Resources Director position, effective January 1, 2012. Councilmember Michael Plunkett proposed the amendment. In fourteen years on the Council, Mr. Plunkett had never before eliminated a position that was occupied. In his view, however, elimination of funding for the HR Director position was appropriate because the job was vacant (since Ms. Humann had been fired eight weeks earlier). Members of the City Council believed that they were allowing the incoming mayor to make his own decision regarding staffing of the Human Resources Department.  City directors were "surprised" by the vote and the fact that "it transpired so quickly and almost at the end of the [council] meeting."

**I.**     **Newly-Elected Mayor Earling Reinstates and Immediately Lays Off Ms. Humann.**

Mayor Earling entered office on November 29, 2011. During the next two weeks, Earling received extensive briefings regarding Ms. Humann's termination, her pending

PLAINTIFF'S TRIAL BRIEF- 8
2:13-CV-00101-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798   (206) 682-6711

whiteblower complaint, Webber's investigation into Cole's hostile work environment complaint, and Coskey's investigation of Ms. Humann's whistleblower complaint.

On December 13 Earling announced he was going to reinstate Ms. Humann to her position as Human Resources Director but lay her off on December 31. The City's press release explaining Mayor Earling's decision states:

> Having been fully advised, I was not able to reach a conclusion that Mayor Cooper retaliated against Debi Humann, but in light of various apparent misunderstandings between Mr. Cooper and Ms. Humann, I am going to give Ms. Humann the benefit of the doubt. As a result, I am reinstating Ms. Humann as the Human Resources Director for the remainder of the year. At the end of the year, she will be laid off due to the City Council's elimination of the position.

Mayor Earling has testified that the "fault" he attributed to Ms. Humann was pressing the issue that the City was paying Cole for work she did not perform.

Earling reinstated Ms. Humann as Human Resources Director without back pay for two weeks from December 15 to December 31. Despite attributing his decision to lay off Ms. Humann to the budget decision of the City Council, Mayor Earling conceded in his deposition that he made the choice to layoff Ms. Humann as opposed to another HR employee with less HR experience. City employees were confounded by the Mayor's decision to reinstate Ms. Humann only to lay her off two weeks later. When questioned about his decision to reinstate and then lay off Ms. Humann, Earling responded only that he "had to make that decision." Earling would not explain why he made his decision.

**J.    Ms. Humann Files a Second Whistleblower Complaint.**

Ms. Humann filed a second whistleblower complaint against the City on December 22, 2011, asserting that she suffered retaliation when the City eliminated her Human Resources Director position. On December 28, 2011, Ms. Humann's attorney requested an administrative hearing on Ms. Humann's whistleblower complaint. Upon receiving Ms. Humann's request for

PLAINTIFF'S TRIAL BRIEF- 9
2:13-CV-00101-MJP

a hearing, City Councilmember D.J. Wilson wrote the other City Councilmembers: "Looks like Jeff [Taraday]'s strategy to reinstate Ms. Humann was poor counsel yet again." Ms. Humann was laid off two days later at the close of business on December 31.

**K.   Ms. Humann Continues to Suffer the Effects of Cooper's Public Statements and the Termination of Her Employment.**

Ms. Humann's termination became a frequent subject of discussion and speculation in Edmonds. She is frequently recognized and questioned regarding her very public termination in Edmonds. Humann had intended to continue working in her field of human resource management. After her termination, she applied for approximately 90 human resources positions but did not receive a single interview. Eventually, in March 2012, Ms. Humann accepted a job as a union business agent, but this is not a human resources position. It is unlikely that Ms. Humann will ever secure work in human resources again due to Cooper's public accusations implying that she is dishonest, cannot keep confidences, and is untrustworthy.

**L.   Procedural History**

Ms. Humann pursued an administrative hearing before the Office of Administrative Hearings in 2012. She accepted an offer of judgment from the City of Edmonds regarding her claim for back pay and benefits from the date of her September 22, 2011 termination until her December 15, 2011 reinstatement.  Ms. Humann received $33,000.00 in back pay and benefits plus $5,500.00 in pre-judgment interest plus attorney's fees and costs. Ms. Humann accepted the settlement after the administrative law judge determined he had no jurisdiction over subsequent events. Ms. Humann filed this lawsuit seeking to fully resolve her claims including recovery for emotional distress (not available in the administrative hearing) and ongoing loss of back pay since her December 31, 2011 layoff.

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798   (206) 682-6711

### III.   ISSUES FOR TRIAL

**A.   Overview of Substantive Claims for Trial**

**1.   Wrongful Termination – September Termination**  (City of Edmonds)

To prevail on a claim for wrongful termination in violation of public policy, the plaintiff must prove the following elements: (1) "the existence of a clear public policy (the *clarity* element);" (2) "that discouraging the conduct in which the employee engaged would jeopardize the public policy (the *jeopardy* element);" (3) "whether the public-policy-linked conduct caused the dismissal (the *causation* element)" and (4) that the City cannot "offer an overriding justification for the discharge (the *absence of justification* element)." *Piel v. City of Federal Way*, 177 Wn.2d 604, 610, 306 P.3d 879 (2013). The Court has determined, as a matter of law, that Ms. Humann has proved the clarity and jeopardy elements for her wrongful termination claims. *Dkt. #87* at 20-21.

Thus, the only remaining issues for trial are causation and absence of justification. An employee establishes that protected activity caused the wrongful discharge by showing an unlawful reason was a "substantial factor" in the employer's decision. *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn.2d 46, 71-72, 821 P.2d 18 (1991). This case involves significant admissions concerning causation. The evidence will also show that certain after-the-fact  reasons for Ms. Humann's termination are pretext for retaliation. A pretext instruction to the jury will alert the factfinders that they may infer an unlawful motive where the defendant's proffered explanation is "unworthy of belief". *See Disputed Instruction No. 5.*  Moreover, an employee's perceived disloyalty because she opposed unlawful activity is not a legitimate basis for termination.  *See Disputed Instruction No. 6.* The jury will have no difficulty finding that Ms. Humann's protected activity "tippe[d] the scales" in Mayor Cooper's decision to fire her. *See Renz v. Spokane Eye Clinic*, P.S., 114 Wn. App. 611, 621, 60 P.3d 106 (2002).

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104–1798   (206) 682–6711

Not every "legitimate reason" for termination alleged by the employer is sufficient to outweigh public policy and qualify as an "overriding justification." *See Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 913 P.2d 377 (1996). As discussed below, as a matter of law there is no overriding justification applicable to this claim.

**2.      First Amendment Retaliation – Elimination of Funding**  (City of Edmonds)

To prevail on a claim for First Amendment retaliation, Plaintiff must show she (1) spoke or petitioned on a matter of public concern; (2) outside the scope of her official job duties; and (3) suffered an adverse employment action as to which her protected speech was a substantial or motivating factor. *Karl v. City of Montlake Terrace*, 678 F.3d 1062, 1068 (9th Cir. 2012). Because Ms. Humann was not employed by the City when she filed her whistleblower complaint and issued a press release there is no dispute that Ms. Humann spoke outside the scope of her official job duties (since she had none). In addition, the Court has decided as a matter of law that Ms. Humann's whistleblower complaint and press release involved a matter of public concern *Dkt. #87* at 8 (finding statements "clearly reference her concern over potential misuse of public funds, a quintessential matter of public concern.").

The question for the jury is whether Ms. Humann's speech/petitioning activities was a substantial or motivating factor in the City Council's decision to eliminate funding for the very position to which she was seeking reinstatement. The jury can easily conclude from the circumstantial evidence including the timing, notice, negative media coverage, and unusual character of the Council's decision that the decision to eliminate funding for the HR Director position was retaliation in violation of the First Amendment.

**3.      First Amendment Retaliation – December Lay Off**  (City of Edmonds)

Plaintiff must prove the same elements in her First Amendment retaliation claim arising from her December 31 layoff.  It is the law of the case that Ms. Humann spoke or petitioned on

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798   (206) 682-6711

a matter of public concern. There is no dispute that her speech was outside the scope of her official duties. The Court has determined that, in context, "the rehiring and layoff of Ms. Humann constituted an adverse employment action." *Dkt #87* at 9.

The only question for the jury is whether Ms. Humann's protected speech was a substantial or motivating factor in Mayor Earling's decision to reinstate and immediately lay off Ms. Humann. Mayor Earling explained that he laid off Ms. Humann two weeks after he reinstated her "due to the City Council's elimination of the [Human Resources Director] position." This statement conflicts with the evidence. It also conflicts with the Mayor's own admission during his deposition that he was aware of his choice and knew he had the authority to retain Ms. Humann, the more senior and experienced employee after December 31. The jury will conclude that Mayor Earling's act -- and false attribution of the act to City Council rather than his own choice -- was substantially motivated by Ms. Humann's whistleblower claim and accompanying press release.

4.    **Wrongful Termination – December Lay Off** (City of Edmonds)

The elements of Plaintiff's wrongful termination in violation of public policy claim arising from her December 31 lay off are identical to those stated above. Again the only issues for the jury are causation and overriding justification.  As stated below, as a matter of law, there is no overriding justification outweighing the public policy interest prohibiting retaliation against former local government employees for filing a whistleblower complaint.

The evidence will show that Mayor Earling wrongfully terminated Ms. Humann's employment in violation of public policy when he reinstated Ms. Humann's employment only to immediately lay her off. The same evidence establishing that Mayor Earling violated the First Amendment when he retaliated against Ms. Humann because of her whistleblower

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798   (206) 682-6711

complaint and press release will establish that her conduct "tipped the scales" in his decision to lay her off in violation of Washington public policy.

### 5.     Deprivation of Liberty Interest Without Due Process
(City of Edmonds & Defendant Cooper)

A public employer violates an employee's rights if in terminating the employee, the employer makes a charge "that might seriously damage [the employee's] standing and associations in his community" or "impose[s] on [the employee] a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972). "Accusations of dishonesty or immorality are sufficiently stigmatizing to implicate a liberty interest…" *Blantz v. Cal. Dep't of Corrections et al.*, 727 F.3d 917, 925 n.6 (9th Cir. 2013). The Court found that "Mayor Cooper's statements touched on Plaintiff's trustworthiness and ability to maintain confidentiality-these statements are very similar to accusations of dishonesty." *Dkt. #87* at 17.

A due process claim requires evidence of (1) a termination of employment; (2) accompanied by public statements that impair the employee's reputation for honesty or morality; and which (3) effectively exclude, or cause a prolonged interruption of, employment in the plaintiff's chosen field; if (4) the plaintiff contests the accuracy of the statements; and (5) is not provided an opportunity to clear her name. *Disputed Instruction No. 14.* Only elements

Ms. Human need only prove that she contested the accuracy of the stigmatizing statements and was deprived of an opportunity to clear her name. *See Matthews v. Harney County Sch. Dist. No. 4,* 819 F.2d 889, 891-92 (9th Cir. 1987). These elements are undisputed. The burden is on the government to provide the employee with an opportunity to clear her name. *See, e.g., King v. Garfield Cnty. Pub. Hosp. Dist. No. 1*, 12-CV-0622-TOR, 2014 WL 1744179 (E.D. Wash. May 1, 2014) (the burden is on the government to provide the person an

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798   (206) 682-6711

opportunity to clear his name); *Howard v. Contra Costa Cnty.,* 13-CV-03626 NC, 2014 WL 824218 (N.D. Cal. Feb. 28, 2014) (citing cases to show that that the majority of district courts in the Ninth Circuit do not require the plaintiff to request a name-clearing hearing before raising a liberty interest claim).

The remaining issue for the jury is whether the public statements were sufficiently stigmatizing and caused a prolonged interruption of Plaintiff's employment in the Human Resources field. Evidence of the repeated publication of Defendant Cooper's "lack of trust" in news articles announcing her termination as well as her inability to secure comparable employment will satisfy the jury that the statements implicated a liberty interest. The jury will determine that the City deprived Ms. Humann of a liberty interest without due process when Cooper made stigmatizing statements to City employees and the press in connection with her termination, thereby foreclosing her ability to work in her profession, without giving her an opportunity to clear her name.

6.    **Defamation**  (City of Edmonds & Defendant Cooper)

A plaintiff alleging a defamation claim must prove four elements: (1) a false statement, (2) publication, (3) fault, and (4) damages. *Duc Tan v. Le*, 177 Wn.2d 649, 662, 300 P.3d 356 (2013). *See Disputed Instruction No. 16.* At issue are two statements by Cooper that contain defamatory statements about her: (1) Cooper's September 22, 2011, statement announcing her termination, and (2) Cooper's statement printed in the *Seattle Times* on October 5, 2011. These statements implied that Ms. Humann was not trustworthy, could not keep confidences, and was dishonest. Cooper's statements to the media were published and republished more than 50 times over the next two years.

Whether a communication is capable of a defamatory meaning (i.e. probably false) is a legal question for the court.  *See Swartz v. World Pub. Co.*, 57 Wash. 2d 213, 215, 356 P.2d 97,

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798   (206) 682-6711

98 (1960). This Court has determined that Mayor Cooper's statements are capable of defamatory meaning. *Dkt. #87* at 11-12.

It is now up to the jury to decide whether the statements were false. *Id*. The jury will hear evidence detailing the "series of events" which led to a "breakdown in trust." It will then determine whether the allegations against Ms. Humann are true or false. The jury will hear that investigator Webber has already determined that many of the allegations stemming from Ms. Cole are false. The jury will also learn that Defendant Cooper relied on an individual who was not credible and failed to investigate the accuracy of the claims before issuing his public statements. They will also hear about the Mayor's interest in his own ongoing political campaign. From this evidence, the jury will conclude that Defendant Cooper acted with "actual malice." *Disputed Instruction No. 21*. They will have no trouble finding that his false statements injured Ms. Humann in her public reputation and in her profession.

**B.   Plaintiff's Issues of Law**

**1.   The Court should determine as a matter of law that Defendants have no overriding justification that outweighs the public policy interest of encouraging reporting of government corruption and misuse of public funds.**

Where a defendant-employer asserts that a legitimate interest of the employer's overrides the public policy interest, it is for the court to determine whether the employer's interest outweighs the public policy concern. *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 913 P.2d 377 (1996).  For instance, in *Gardner*, the Court concluded that the defendant-employer had a legitimate interest in protecting the safety of its workers and the contents of its armored trucks. The Court nevertheless held that such an interest did not override the public policy of safeguarding human life.  128 Wn.2d at 947-48. The Court explained that its role was to "balance the public policies" raised by the plaintiff against the "legitimate interest" of the

PLAINTIFF'S TRIAL BRIEF- 16
2:13-CV-00101-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798  (206) 682-6711

employer. *Id.* at 948-48. *See also Danny v. Laidlaw Transit Services, Inc.,* 165 Wn.2d 200, 225, 193 P.3d 128 (2008) (plurality opinion) (clarifying that the "balancing" in *Gardner* was part of the "absence of justification" element analysis rather than the "jeopardy" analysis).

Overriding justification is an issue of law for the Court.  Professor Perritt well-explained the rationale for entrusting the balancing of interest to the court:

> It is desirable for the judge to retain control over the balancing process.  Only in this way can the appellate courts retain adequate control over the direction in which the public policy balance is struck.  If juries are allowed to strike the balancing in individual cases, the constraints on employer discretion will be unpredictable and the outcomes largely immune from appellate review.

Perritt, Henry H., *Employee Dismissal Law and Practice,*§ 7.08 at 7-101 (5th ed. 2010 supplement). It is for the Court to decide whether an "overriding justification" exists.

The overriding justification element is not a same action defense that enables the City to argue that it would have reached the same termination decision in the absence of the plaintiff's public-policy-linked conduct.  Instead, it requires the Court to balance the City's reasons for its actions against Washington public policy.   There are two public policies implicated in this case: the policy prohibiting retaliation against local government employees who report corruption or misuse of public funds and the policy prohibiting retaliation against former local government employees for filing a whistleblower complaint.  The reasons offered by the City to justify Ms. Humann's termination do not outweigh the public's interest in encouraging reporting of government corruption. The justifications offered by the City to explain the selection of Ms. Humann for layoff due not override the public's interest in preventing retaliation against whistleblowers. At the close of the evidence, Plaintiff will move the Court for a directed verdict finding that no overriding justification exists.

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798   (206) 682-6711

2.     **The Court should permit Plaintiff to ask leading questions of witnesses identified with the City's interests and limit Defendants to non-leading questions within the scope of direct examination.**

In employment cases, calling adverse witnesses in the plaintiff's case is frequently the only way to admit critical evidence. For example, Ms. Humann must call Defendant Cooper, Mayor Earling, and Councilmember Plunkett and many other interested witnesses to establish the elements of her claims and to demonstrate that the employer's after-the-fact reasons for termination are pretext for retaliation. Employment cases are already difficult because there is rarely "smoking gun" evidence of retaliatory intent. *United States Postal Serv. Bd. Of Governors v. Aikens*, 406 U.S. 711, 716 (1983). The need to rely upon testimony from witnesses hostile to the plaintiff's position and who are represented by opposing counsel creates additional hurdles.  Ms. Humann also carries the burden of proof and persuasion. Because of these inherent difficulties, Ms. Humann asks this Court to exercise reasonable control over the mode and order of examining witnesses and presenting evidence to fashion fair procedures that are effective for determining the truth per Fed. R. Evid. 611(a).

To be fair, Ms. Humann must be permitted to call an adverse witness, use leading questions, and limit the testimony of that witness to the scope of plaintiff's direct (so the defendant may recall that witness during the defense case to present the remainder of the witnesses' testimony); otherwise, the defendant may be able to exceed the scope of direct and put on some or all of the defense case during plaintiff's case.  This is unacceptable. It dilutes plaintiff's presentation, may confuse the jury, and unfairly shifts the case presentation order effectively penalizing the plaintiff for calling the adverse witness whose testimony is necessitated by difficulties in proving these cases.  Fed. R. Evid. 403 and 611 both instruct that courts should fashion procedures for the admission of testimony so as to avoid confusing the issues and encourage determination of the truth.

PLAINTIFF'S TRIAL BRIEF- 18
2:13-CV-00101-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798   (206) 682-6711

Ordinarily, the Court should allow leading questions when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party.  Fed. R. Evid. 611(c). Likewise, where a witness is designated as adverse, hostile, or identified with an adverse party, the trial judge may prohibit the use of leading questions by the cross-examiner. *See Mitchell v. U.S.*, 213 F.2d 951, 955 (9th Cir. 1954). A witness is "identified with" an opposing party when the witness's interests in the litigation can reasonably be expected to be either identical to those of the adverse party or both closely aligned with those of the adverse party and of comparable significance. *Bixby v. KBR, Inc.*, 2012 WL 475942 at *3 (D. Or. 2012). For example, under Fed. R. Evid. 611, an opposing party's employee is identified with the adverse party. *See Chonich v. Wayne County Community College*, 874 F.2d 359, 368 (6th Cir.1989). This analysis is not identical to hearsay analysis. Treating the witness as identified with the opposing party for purposes of witness questioning does not deem the witnesses' statements an admission of a party opponent.

Because of the nature of this case, the majority of witnesses to be called in plaintiff's case in chief are represented by the City of Edmonds.[3] Many of the remaining witnesses are former agents of the City of Edmonds or are strongly identified with the City's interests.[4] It is appropriate for the Court to classify in advance some witnesses as "affirmatively viewable as hostile because of the situation, *viz.*, classifiable in advance as hostile." *Suraez Matos v. Ashford Presbyterian Community Hosp., Inc.*, 4 F.3d 47, 50 (1st Cir. 1993) (citing *Ellis v. City of Chicago*, 667 F.2d 606, 612-13 (7th Cir. 1981)). A pre-trial ruling allows the parties to prepare for direct and cross-examination with certainty of the Court's position and to have

---

[3] *See* Proposed Pretrial Order, *Dkt. #__* (Sept. 10, 2014) designating the following witnesses as represented by the City of Edmonds: Al Compaan, Dave Earling, Mary Ann Hardie, Carrie Hite, Sandy Chase, Sharon Cates, Jeff Taraday, Scott Pasey, Strom Peterson, and Phil Williams.
[4] Micheal Cooper is an adverse party. DJ Wilson and Michael Plunkett are former City Councilmembers. Jim Webber is the investigator hired by the City's outside counsel to complete an investigation on its behalf.

PLAINTIFF'S TRIAL BRIEF- 19
2:13-CV-00101-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798   (206) 682-6711

meaningful control over the time allotted for each side to present its case and the persuasive presentation of the evidence.

Therefore, Ms. Humann requests a directive from the Court permitting her to direct leading questions toward witnesses identified with the City on direct examination and barring the City from utilizing leading questions on cross-examination of its own witnesses. Plaintiff also seeks confirmation that cross-examination will be limited to the scope of direct as outlined in Fed. R. Evid. 611.

## C.    Defendants' Issues of Law

### 1.    The jury should be instructed that the period of recovery for back pay begins on September 22, 2011 – the date of the original unlawful termination.

The parties seek to avoid a double recovery to Ms. Humann arising from her acceptance of an offer of judgment during the administrative proceeding.  However, they disagree on the appropriate resolution. Ms. Humann received $33,000.00 in back pay and benefits plus $5,500.00 in pre-judgment interest for the period from her September 22, 2011 termination until her December 15, 2011 reinstatement. Defendants have moved *in limine* to prevent disclosure of evidence of the settlement to the jury.  *Dkt. #81*  at 4-5.  The parties agree that Plaintiff cannot recover back pay and pre-judgment interest again for the same period. Plaintiff also agrees to Defendant's *in limine* request if it can be accomplished with minimal jury confusion.

Ms. Humann intends to present evidence at trial that Mayor Earling could have reinstated her with back pay but chose not to do so. This decision by the Mayor is relevant to his state of mind and tends to rebut his claim that he reinstated Ms. Humann because it was "the right thing to do."  The fact that Mayor Earling chose not to pay Ms. Humann back pay when he reinstated her is a relevant fact for the jury. However, there is no need to "estop" Ms.

PLAINTIFF'S TRIAL BRIEF- 20
2:13-CV-00101-MJP

Humann from seeking double recovery for the September – December 2011 period because she has no intention of doing so. Plaintiff will call economist Robert Patton to testify concerning Ms. Humann's lost wage calculations. Dr. Patton's lost wage calculations calculate wage loss from 2012 through the date of trial. *See* Appendix A at 1, 3 (highlighted). Dr. Patton is aware that Ms. Humann has already recovered lost wages from 2011. He therefore excluded the 2011 period from his calculations. Plaintiff will ask the jury to compensate Ms. Humann's economic damages as calculated by Dr. Patton. She will not seek back pay for the period already compensated.

During a conference of the parties, Defendants agreed that Ms. Humann is entitled to seek recovery of all lost wages proximately caused by her September 22, 2011 termination.[5] This means that Ms. Humann can recover lost wages flowing from her September 2011 termination but may not double collect for lost pay already received. Defendants may suggest that the Court instruct the jury that Ms. Humann can only recover lost wages for the period after December 31, 2014 (when she was laid off). While Plaintiff agrees that this is a factually correct statement, the instruction risks confusing the jury who will not understand why a portion of her lost wages is not recoverable. Plaintiff cannot risk jury speculation that Ms. Humann is somehow at fault and is therefore not entitled to full wage recovery.

---

[5] Confusingly, in the Proposed Pretrial Order Defendants address the matter of back pay recovery as one of "collateral estoppel," res judicata, issue preclusion and/or claim preclusion. These terms concern the resolution of claims actually litigated on the merits. *Brown v. Felsen*, 442 U.S. 127, 138 n. 10 (1979). Because Ms. Humann could not have asserted her claim for wrongful termination in violation of public policy in the administrative proceeding, there is no claim preclusion here. *See, e.g., Robi v. Five Platters, Inc.*, 838 F.3d 318, 321 (9th Cir. 1988) ("Claim preclusion treats a judgment, once rendered, to be the full measure of relief to be accorded between the same parties on the same claim or cause of action."). The partial wage recovery is also not, as Defendant Cooper suggests, an "accord and satisfaction." An accord and satisfaction is the "substitution of a new agreement for and in satisfaction of a pre-existing agreement between the same parties." *Red Alarm, Inc. v. Waycrosse, Inc.*, 47 F.3d 999, 1002 (9th Cir. 1995). Ms. Humann's wrongful termination claim has never been decided on the merits. Nor did Ms. Humann waive any right to pursue a claim of wrongful discharge in this forum. These arguments were implicitly rejected by the Court in its Order on Summary Judgment granting plaintiff's motion to amend her complaint to make minor technical corrections. *Dkt. #87* at 21-22.

PLAINTIFF'S TRIAL BRIEF- 21
2:13-CV-00101-MJP

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798   (206) 682-6711

Instead, Plaintiff proposes that the jury be instructed on the law, which is that the period of recovery for back pay starts at the point that there is a retaliatory act causing the plaintiff to suffer her injury. *O'Neill v. Sears, Roebuck & Co.*, 108 F. Supp. 2d 443, 447 (E.D. Pa. 2000). The jury may safely rely upon the figures provided by Dr. Patton because they include an offset for settlement money already received. Plaintiff will not seek a double recovery. There is no need for a limiting instruction or other action.

2. **The City has the burden to establish that Ms. Humann would not have been retained even in the absence of her wrongful discharge. Whether front pay is the appropriate remedy for Defendants' discriminatory acts is a fact question for the jury.**

The City seeks a Court order finding, as a matter of law, that Ms. Humann cannot recover front pay beyond December 31, 2011 or seek reinstatement because the Human Resources Director was not included in the 2012 budget adopted by the Edmonds City Council. This Court has held that whether the elimination of funding for the HR Director position was illegal is a matter for the jury. *Dkt. #87* at 7.

The City misunderstands the applicable law. When an employee is discharged for unlawful reasons and her position is thereafter eliminated, the presumption is that the employee would have been retained in some other capacity had she not been wrongfully fired. *See Xieng v. People's Nat. Bank of Washington,* 63 Wn.App. 572 (1991), *aff'd*, 120 Wn.2d 512 (1993) (affirming award of lost wages to employee fired for discriminatory reasons where position was subsequently eliminated). *See also Disputed Instruction 34.* In *Xieng*, the Washington Court of Appeals held that to avoid liability for lost wages after elimination of the sought after position, the employer has the burden of proof to establish that the employee "would not have been retained in some other capacity."  *Xieng*, 63 Wn.App. at 584 (citing *Archambault v. United*

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798   (206) 682-6711

*Computing Sys., Inc.*, 786 F.2d 1507, 1515 (11th Cir.1986)). [6] Therefore, whether Ms. Humann would have been retained and whether front pay is available to her revolves around disputed issues of fact appropriate for the jury.

Here, the jury is likely to find that the decision to eliminate funding would not have occurred but for Ms. Humann's wrongful termination. For instance, Councilmember Plunkett testified that he eliminated funding because the position was vacant. The jury could also find that neither the decision to fire Ms. Humann nor the decision to eliminate funding for her position was illegal. Even then, the jury could still decide that Mayor Earling's choice to layoff Ms. Humann rather than another HR employee with less HR experience was retaliation for Ms. Humann's protected speech. Under any of these scenarios front pay is appropriate. The impact (if any) on Ms. Humann's damages caused by the City Council's decision to eliminate funding is a factual question for the jury.

In wrongful discharge cases, the trial court retains sound discretion in fashioning a remedy. *Cassino v. Reichhold Chems, Inc.*, 817 F.2d 1338, 1347 (9th Cir. 1987). Although reinstatement is the preferred remedy, it may not be feasible where the relationship is hostile or no position is available due to a reduction in force. *Id.* (citations omitted). Under such circumstances, an award of future damages or "front pay" in lieu of reinstatement makes the victim of discrimination whole. *Id.* In this case, Plaintiff would join Defendants in stipulating that hostility toward the Plaintiff makes reinstatement untenable and that "front pay" in lieu of reinstatement would be sufficient to make her whole.

**3.     The Court has already resolved that Defendant Cooper is not entitled to absolute immunity.**

By order dated August 19, 2014, the Court determined that Defendant Cooper is not

---

[6] Affirming, the Washington Supreme Court noted that the employer had retained employees in an equivalent position with similar job duties. *Id.* at 532.

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798   (206) 682-6711

entitled to absolute privilege for his statements which questioned Plaintiff's trustworthiness and ability to maintain confidentiality, statements very similar to accusations of dishonesty. *Dkt. #87* at 14, 17.  No Washington case law supports Defendant Cooper's assertion of an absolute privilege. *Dkt. #87* at 14 (citing *Bender v. City of Seattle*, 99 Wn.2d 582, 600 (1983)).  The Court also found that "the basic law on the process due to government employees who are both terminated and subjected to stigmatizing statements in connection with that termination has been clear since 1988." *Dkt. #87* at 19 (citing *Roth v. Veteran's Admin.*, 856 F.2d 1401, 1411 (9th Cir. l988), overruled on other grounds by *Garcetti v. Ceballos*, 547 U.S. 410 (2006). Therefore, Defendant Cooper is not entitled to qualified immunity on Plaintiff's due process claim. *Id.*

> **4.     The Court has already resolved that the statements of Defendant Cooper are capable of defamatory meaning. The jury must determine whether Mayor Cooper's statements were false, made with actual malice, and injured Plaintiff's reputation in the community.**

As a matter of law, the Court determined that Mayor Cooper's statements to the public and the press were capable of defamatory meaning. It is the law of the case that his statements are not mere opinion.  *See Dkt. #87* at 11, 13-14 (finding the statements capable of defamatory meaning).  The Court addressed whether Mayor Cooper's statements were fair comment and rejected Defendant Cooper's argument finding that his statements contained implied statements of fact. *Id.* at 13. Courts have found such implied facts in statements regarding plaintiffs' trustworthiness. *Id.* (citing *Rhea v. Dollar Tree Stores, Inc.*, 2005 WL 2600213, *11 (W.D. Tenn. Oct 12, 2005)). The legal issues regarding characterization of Defendant Cooper's statements have been resolved as a matter of law. The jury must decide whether the statements were indeed false.  *See Dkt. #87* at 11-14.

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798  (206) 682-6711

**5.      Nancy Bartley may testify to rebut Defendant Cooper's assertions that he had not made statements attributed to him to the Seattle Times.**

Defendant Cooper seeks an order excluding witness Nancy Bartley, a Seattle Times reporter, from testifying at trial on the grounds that she was not properly disclosed. This argument misapprehends the court rules of witness disclosure.  On August 21, 2014, Defendant Cooper filed a Motion to Reconsider in which he asserted that he had not made statements attributed to him in the Seattle Times newspaper.   Dkt. #89 at 2. Defendant's motion alerted Plaintiff to the possible need to call the reporter who reported the statement as a rebuttal witness should Defendant Cooper so testify at trial.   On September 5, 2014, Plaintiff supplemented her pretrial statement to designate the reporter.   Such supplementation is permissible under Local Civil Rule 16(h)(5) which provides that "Rebuttal witnesses, the necessity of whose testimony cannot reasonably be anticipated before trial, need not be named." Where the rebuttal witnesses' testimony was not foreseeable, the nature of the anticipated testimony is known, and the witness is nonetheless named in the pretrial order filed more than 7 weeks before trial, there is no prejudice to Defendant Cooper in permitting Ms. Bartley to testify if needed as a rebuttal witness.


RESPECTFULLY SUBMITTED this 10th day of September, 2014.

> _/s/_Beth Barrett Bloom
> Beth Barrett Bloom, WSBA #31702
> Jillian M. Cutler, WSBA #39305
> Frank Freed Subit & Thomas
> Email:  bbloom@frankfreed.com
>                jcutler@frankfreed.com

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798   (206) 682-6711

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Appendix A**

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798  (206) 682-6711

**ROBERT T. PATTON, PH.D.**
**FINANCIAL AND ECONOMIC CONSULTANT**
**1100 CHUCKANUT CREST LANE**
**BELLINGHAM, WA 98229**
**(360) 647-7777, Cell (360) 305-7132**

February 14, 2014

Debi Humann
Date of Birth: August 23, 1958
Date of Termination: September 22, 2011   Age 53
Date Reinstated: December 15, 2011
Date Laid Off: December 31, 2011

# SCENARIO I
# ECONOMIC LOSS
### Based on HR Director

At the time of her termination, Debi Humann was working for the City of Edmonds as the Human Resource Director. Her salary was set at $108,944.50 per year. After being reinstated briefly, she was separated from this position permanently on December 31, 2011. Assuming that her earnings as a Director would have increased at the rate indicated in the Annual Salary Schedule for salary range 20 with annual step increases, her 2012 earnings at Step 3 would be $112,602. Her 2013 earnings at Step 4 would be $120,597 and the 2014 earnings at Step 5 would be $128,400 per year. On March 6, 2012, she secured a position as a Business Agent with Teamsters Local Union No. 763 earning $35.07 per hour or $72,946 per year plus bonus. This position is now paying her $74,963 per year plus bonus, partially mitigating her loss of earnings from the City of Edmonds.

Her termination will cause her to experience an economic loss. Her economic loss is calculated in the following manner.

A. ECONOMIC LOSS FROM 1/1/12 TO 9/30/14

| YEAR | CALCULATION | AMOUNT |
|------|-------------|--------|
| 2012 | $112,602/yr. - $61,535 (actual) | $51,067 |
| 2013 | $120,597/yr. - $75,303 (actual) | 45,294 |
| 2014 | $128,400/yr. - $76,413 (estimated) for ¾ year | 38,990 |
| **Economic Loss to Date from Lost Earnings** | | **$135,351** |

**NOTE:** The actual and estimated earnings from the Teamsters includes the following holiday bonus payments: 2012 - $1,415; 2013 - $1,442 and 2014 – estimated to be $1,450.

Also, it is noted that there is a discrepancy between the Teamsters salary payments and the reported income on the IRS Form W-2 for 2012 and 2013. This discrepancy is explained by the practice of the Teamsters to report reimbursement for employee business expenses as taxable salary rather than expense reimbursement.

1

**Exhibit 136**

When allowed, the prejudgment interest at 12%/yr. on the lost earnings to date is **$21,739**. This is based on a calculation of simple interest on lost earnings between 1/1/2012 and 9/30/14. Interest is not compounded during this period.

B. PRESENT CASH VALUE OF FUTURE ECONOMIC LOSS FROM 10/1/14 to 9/30/23.

The present cash value of the future economic loss is based on the facts and assumptions listed below.

1. It is assumed that Debi Humann would have remained in her position as Human Resource Director for the City of Edmonds. Based on the salary schedule published by the City of Edmonds, her annual earnings in 2015 at Step 6 would be **$134,819** in current dollar terms and in 2016 at Step 7 would be **$141,561** in current dollar terms. Step 7 is the highest step in the salary schedule and no step increases are projected after 2016. However, additional COLA increases should be expected during these years that would raise the current dollar amounts per the currently published salary schedules. The exact amount of COLA adjustments will depend on a number of variables that are unknown at the present time.

2. It is assumed that Debi Humann will now mitigate her lost earnings by continuing to work in her position with Teamsters Local Union No. 763, earning **$76,413** per year in current dollar terms. This includes an estimated holiday bonus of **$1,450** per year. Additional future COLA increases are also expected in this employment although the exact amount will depend on a number of variables that are unknown at the present time. It is assumed that these COLA adjustments will be comparable to those at the City of Edmonds in the future.

3. It is assumed that she would have had the opportunity to continue working in her position as Human Resource Director until the end of September 2023. This will allow her to reach her 65th birthday and become eligible for health insurance from Medicare. The actual retirement age for full Social Security benefits will be 67 in 2023 under present law. This retirement age may be increased again by Congress between now and 2023.

4. A **1%** net discount rate is used to discount future earnings losses to present cash value. This assumes that the prevailing interest rate on safe investments will generally average 1% greater than the average rate of wage growth. This assumption is based on the following economic data.

UNITED STATES ECONOMIC DATA
Average Annual Rate of Change

| Item | 20 year Average 1993-12 | 10-year Average 2003-12 |
|---|---|---|
| Wage Growth | | |
| Compensation/Hr. | +3.32% | +3.06% |
| Hourly Earnings | +3.18% | +2.82% |
| Weekly Earnings | +3.02% | +2.79% |

2

Inflation
| CPI Total | +2.44% | +2.47% |
| Medical Care | +3.90% | +3.81% |

Interest Rates
| 3 mo. T-Bills | +3.00% | +1.66% |
| 3 Yr. T-Notes | +3.85% | +2.38% |
| 10 Yr. T-Bonds | +4.78% | +3.67% |

5.  It is assumed that employment with the Teamsters or employment at the City of Edmonds
    would each continue to provide healthcare insurance and an employer provided pension
    program. Although the exact nature of these benefits are likely to have different features
    and may change over time as a result of employer decisions and/or legislation, it is
    assumed that the value of these benefits will be approximately equivalent to the
    employee. Therefore, no addition is made for lost fringe benefits.

The present cash value of the future economic loss from the loss of earnings is calculated to
be **$551,383**, between 10/1/14 an 9/30/23.

# SCENARIO II
# ECONOMIC LOSS
### Based on HR Manager

At the time of her termination, Debi Humann was working for the City of Edmonds as the
Human Resource Director. Her salary was set at $108,944.50 per year. After being reinstated
briefly, she was separated from this position permanently on December 31, 2011. Assuming that
she would have been re-employed as the Human Resource Manager on January 1, 2012 her
earnings as a Manager would have been set at the rate indicated in the Annual Salary Schedule
for salary range 15, Step 3, with annual step increases. Her 2012 earnings would have been
$88,227 and her 2013 earnings at Step 4 would have been $94,491. In 2014 her earnings would
be $100,604 per year at step 5. On March 6, 2012, she secured a position as a Business Agent
with Teamsters Local Union No. 763 earning $35.07 per hour or $72, 946 per year plus bonus.
This position is now paying her $74,963 per year plus bonus, partially mitigating her loss of
earnings from the City of Edmonds.

Her termination will cause her to experience an economic loss. Her economic loss is
calculated in the following manner.

A. ECONOMIC LOSS FROM 1/1/12 TO 9/30/14

| YEAR | CALCULATION | AMOUNT |
|------|-------------|--------|
| 2012 | $88,227/yr. - $61,535 (actual) | $26,692 |
| 2013 | $94,491/yr. - $75,303 (actual) | 19,188 |
| 2014 | $100,604/yr. - $76,413 (estimated) for ¾ year | 18,143 |
| | **Economic Loss to Date from Lost Earnings** | **$64,023** |

3

**NOTE:** The actual and estimated earnings from the Teamsters includes the following holiday bonus payments: 2012 - $1,415; 2013 - $1,442 and 2014 – estimated to be $1,450.

Also, it is noted that there is a discrepancy between the Teamsters salary payments and the reported income on the IRS Form W-2 for 2012 and 2013. This discrepancy is explained by the practice of the Teamsters to report reimbursement for employee business expenses as taxable salary rather than expense reimbursement.

When allowed, the prejudgment interest at 12%/yr. on the lost earnings to date is **$10,023**. This is based on a calculation of simple interest on lost earnings between 1/1/2012 and 9/30/14. Interest is not compounded during this period.

B. PRESENT CASH VALUE OF FUTURE ECONOMIC LOSS FROM 10/1/14 to 9/30/23.

The present cash value of the future economic loss is based on the facts and assumptions listed below.

1. It is assumed that Debi Humann would have remained in her position as Human Resource Manager for the City of Edmonds. Based the salary schedule published by the City of Edmonds, her annual earnings in 2015 at Step 6 would be **$105,634** in current dollar terms and in 2016 at Step 7 would be **$110,916** in current dollar terms. Step 7 is the highest step in the salary schedule and no step increases are projected after 2016. However, additional COLA increases should be expected during these years that would raise the current dollar amounts per the currently published salary schedules. The exact amount of COLA adjustments will depend on a number of variables that are unknown at the present time.

2. It is assumed that Debi Humann will now mitigate her lost earnings by continuing to work in her position with Teamsters Local Union No. 763, earning **$76,413** per year in current dollar terms. This includes an estimated holiday bonus of **$1,450** per year. Additional future COLA increases are also expected in this employment although the exact amount will depend on a number of variables that are unknown at the present time. It is assumed that these COLA adjustments will be comparable to those at the City of Edmonds in the future.

3. It is assumed that she would have had the opportunity to continue working in her position as Human Resource Manager until the end of September 2023. This will allow her to reach her 65th birthday and become eligible for health insurance from Medicare. The actual retirement age for full Social Security benefits will be 67 in 2023 under present law. This retirement age may be increased again by Congress between now and 2023.

4. A **1%** net discount rate is used to discount future earnings losses to present cash value. This assumes that the prevailing interest rate on safe investments will generally average 1% greater than the average rate of wage growth. This assumption is based on the following economic data.

4

UNITED STATES ECONOMIC DATA
Average Annual Rate of Change

| Item | 20 year Average 1993-12 | 10-year Average 2003-12 |
|---|---|---|
| Wage Growth | | |
| Compensation/Hr. | +3.32% | +3.06% |
| Hourly Earnings | +3.18% | +2.82% |
| Weekly Earnings | +3.02% | +2.79% |
| | | |
| Inflation | | |
| CPI Total | +2.44% | +2.47% |
| Medical Care | +3.90% | +3.81% |
| | | |
| Interest Rates | | |
| 3 mo. T-Bills | +3.00% | +1.66% |
| 3 Yr. T-Notes | +3.85% | +2.38% |
| 10 Yr. T-Bonds | +4.78% | +3.67% |

5.  It is assumed that employment with the Teamsters or employment at the City of Edmonds would each continue to provide healthcare insurance and an employer provided pension program. Although the exact nature of these benefits are likely to have different features and may change over time as a result of employer decisions and/or legislation, it is assumed that the value of these benefits will be approximately equivalent to the employee.  Therefore, no addition is made for lost fringe benefits.

The present cash value of the future economic loss from the loss of earnings is calculated to be **$290,323,** between 10/1/14 an 9/30/23.

A + B.   TOTAL ECONOMIC LOSS – SUMARY SCHEDULE

| | SCENARIO I BASED ON HR DIRECTOR | SCENARIO II BASED ON HR MANAGER |
|---|---|---|
| Earnings Loss to Date | $ 135,351 | $64,023 |
| Present Value of Future Loss | 551,383 | 290,323 |
| | | |
| **Total Economic Loss** | **$686,734** | **$354,346** |
| | | |
| When allowed, the prejudgment interest 12%/yr. on the lost earnings to date | **$21,751** | **$10,630** |

**NOTE:**   This analysis is based on information available as of February 14, 2014.  New information produced during discovery could require modifications to this analysis.

Respectfully,
Robert T. Patton

*Robert T. Patton*

APPENDIX

Conclusions present in the foregoing report are based on data and information obtained by reviewing the following documents.

1. Personal tax returns and/ W-2 statements from 2007 to 2013.
2. Employment records and/or pay stubs from the City of Edmonds from 2005 to 2011.
3. Plaintiff's fourth discovery requests to City of Edmonds and responses thereto.
4. City of Edmonds Annual Salary schedules for 2012, 2013, and 2014.
5. Retirement files from both City of Edmonds and Teamsters.
6. Economic Data Sheet provided by Plaintiff's attorney.
7. Various U.S. Government economic data contained in ECONOMIC INDICATORS.

## CERTIFICATE OF ELECTRONIC FILING

I, Mia Wadleigh, hereby certify that on September 10, 2014, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

**Attorneys for Defendants City of Edmonds & Dave Earling**

Jayne L. Freeman
Keating, Bucklin & McCormack
800 Fifth Avenue, Suite 4141
Seattle, WA 98104-3175

**Attorneys for Defendant Michael Cooper**

John T. Kugler
Turner Kugler Law, PLLC
4700 42nd Ave. SW, Suite 5940
Seattle, WA 98116

I also hereby certify that I have mailed by U.S. Postal Service, First Class Postage prepaid, the foregoing document to the following non-CM/ECF participants:  NONE.

DATED this 10th day of September, 2014 at Seattle, Washington.

Mia Wadleigh

PLAINTIFF'S TRIAL BRIEF- 27
2:13-CV-00101-MJP